

FILED BY _____ D.C.

JUN 24 2025

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:15-cr-20124-KMW

UNITED STATES OF AMERICA,

vs.

MITCHELL LICHTMAN,
       Defendant.
_____/

### RESPONSE TO GOVERNMENT'S RESPONSE
### IN FURTHER SUPPORT OF COMPASSIONATE RELEASE

    **COMES NOW**, Mitchell Lichtman ("Lichtman"), *pro se*, and respectfully submits his Response to Government's Response in Further Support of his Compassionate Release Motion filed pursuant to 18 U.S.C. §3582(c)(1)(A), (DE: 82), based on the following:

    On May 27, 2025, the Government filed its response to Lichtman's Motion for compassionate release. (DE: 86). The Government, first, concedes that Lichtman exhausted his administrative remedies. But the Government opposes Lichtman's Motion for compassionate release for seven reasons, each of which are addressed below:

    1. **The Government claims that Lichtman failed to establish that if released he will not pose a danger to the public.**

    The Government is mistaken. Both in Lichtman's request to the Warden and in his principle brief he specifically shows how the applicable Section 3142(g) factors determine that he is not a "danger to any person or the community" if released. In support he lists family circumstances, age at time of offense, and post-sentencing conduct. Further he provides that his FSA Recidivism Risk Assessment (PATTERN)—the most accurate predictor of recidivism ever created to date—shows that he is a "Low" risk for recidivism. This risk is lowered further, he explained, by his extensive programming, the majority of

1

which being evidence based recidivism reduction ("EBRR") programs. https://www.prisonlegalprisoners-new-meta-analysis-reinforces-it-reduces-recidivism/

Additionally, Lichtman self-surrendered, accepting responsibility for his crimes. He was released on bond and reported to all Court appearances. Post sentencing, he remained out on bond until time to self-surrender at FCI Miami Low, all done without issue.

Moreover, expert testimony provided at sentencing showed that defendants like Lichtman have an 8.7% chance of recidivating, compared to a typical chance of 40 to 50%. But this 8.7% reduces further in light of the factors of participation in treatment, age, family support, and programming considerations. Being then found by the Doctor to "be an excellent candidate [for] placement in the community with supervision and treatment," the Doctor's position would be only strengthened by Lichtman's programming record and age today, along with his commitment to continue in society with his Anaga psychotherapy.

2. **The Government claims that Lichtman's motion and supporting documentation failed to establish an extraordinary and compelling basis necessary as a prerequisite for the Court to have discretion to grant Lichtman's request for relief.**

Specifically, the Government states that (a) Lichtman's mother's ("A.L.") medical condition of progressive multiple sclerosis was known at the time of sentencing and that (b) there is no information that allows the Government or the Court to assess the extent of A.L.'s disability and ability to provide self-care as of today.

The Government is in error. First, the condition was made known at Lichtman's arrest and sentencing nearly 10 years ago. A.L.'s circumstances have since changed significantly, her condition today being far worse than then.

(a) <u>Scientific Support</u>

The Government seems to use interchangeably and confuse multiple sclerosis (MS) with primary progressive multiple sclerosis (PPMS). This would be a mistake. A.L. has PPMS, which is a distinct

2

form of MS characterized by a *continuous* progression of neurological decline from the onset, without relapses and remissions typical of the more common form of MS called relapsing-remitting MS (RRMS).

Key Differences Between RRMS and PPMS

RRMS accounts for approximately 85% of MS diagnoses. It's characterized by clearly defined attacks (relapses) of worsening neurologic function, followed by periods of partial or complete recovery (remissions). During remissions, all symptoms may disappear. https://www.nationalmssociety.org/understanding-ms/what-is-ms/types-of-ms/relapse-remitting-ms

PPMS, though, represents about 10 – 15% of MS cases. It's defined by a gradual worsening of neurologic function from the onset of symptoms, without relapses or remissions. There is a steady decline in function. Id. *See also* Medical News Today – RRMS vs. PPMS, https://www.medicalnewstoday.com/articles/rrms-vs-ppms

The Expanded Disability Status Scale (EDSS) is a method of quantifying disability in MS and monitoring changes in the level of disability over time. An EDSS score 7.0, for example, indicates that the individual is unable to walk beyond approximately 5 meters even with aid, essentially being restricted to a wheelchair. The transcripts from Lichtman's sentencing represents an established record that provides key information about A.L.'s condition 10 years ago that perfectly aligns with an EDSS of 7.0.

Given the inescapable nature of A.L's PPMS, the passage of 10 years since Lichtman's sentencing means a 100%, unavoidable scientific certainty of severe disability progression on the EDSS. https://mstrust.org.uk/a-z/expanded-disability-status-scale-edss; https://practicalneurology.com/diseases-diagnoses/ms-immune-disorders/prognostic-factors-in-multiple-sclerosis/; https://www.valueinhealthjournal.com/article/.

    (b) Information for the Government and Court to assess the Extent of A.L.'s Disability and Ability to Provide Self-Care

The Government stated that, "in regard to 'medical incapacitation,' the defendant has submitted a one-page medical record dated April 5, 2024," claiming that this medical record is incomplete. It is not. The medical document cited is titled "Medical Necessity Justification Letter." In it, A.L.'s diagnoses list a

3

series of conditions, including Decubitus ulcer of left hip, pressure injury of sacral region (Stage 4) and osteomyelitis. Further, it states that "[i]t is medical [sic] necessary for the...patient to receive wound supplies...." These prove A.L's PPMs has worsened significantly on the EDSS from the date of Lichtman's sentencing (September 25, 2015) to the date of the cited "one-page medical record" (April 5, 2025), and it supports that Lichtman's mother isn't receiving proper care. Specifically:

(i) <u>Decubitus Ulcer of Left Hip</u>

Also known as pressure ulcers or bedsores, these are injuries to the skin and underlying tissue resulting from prolonged pressure on the skin. <u>https://my.clevelandclinic.org/health/diseases/17823-bedsores-pressure-injuries</u>. These ulcers indicate a significant decline in mobility and lead to serious infections. <u>https://www.mssociety.org.uk/living-with-ms/advanced-ms/pressure-ulcers</u>

At the time of Lichtman's sentencing, A.L. did not have bedsores, because she had limited mobility and continuous care.

(ii) <u>Pressure Injury of Sacral Region (Stage 4)</u>

Stage 4 pressure injuries are the most severe, involving full-thickness tissue loss with exposure of muscle, bone, or supporting structures. Such severe pressure injuries are indicative of prolonged complete immobility and occur in bedridden patients. They pose significant risks, including infections like osteomyelitis, and reflect advanced disease progression. Id. *See also* <u>https://www.healthline.com/health/stages-of-pressure-ulcers</u>.

This stage of pressure injury proves that A.L. has no family to care for her. For someone to be left immobile for so long that sores form and worsen to the point of exposing the underlying muscle, bone, or supporting structures, then they have been all but abandoned. (Someone present and capable, as Lichtman would be, would ensure she's regularly turned, stretched and massaged, as A.L.'s condition requires, preventing the development of pressure injuries at any stage.)

(iii) <u>Osteomyelitis</u>

Osteomyelitis is an infection of the bone, the result of Stage 4 pressure injury introducing bacteria to the open wound's surrounding tissue or into the bloodstream, which spreads to the bone. Only the

4

completely incapacitated and uncared for form chronic pressure ulcers; especially, ones that become infected to the point of osteomyelitis. This condition requires immediate medical attention. https://www.mayoclinic.org/diseases-conditions/osteomyelitis/symptoms-causes/; https://radiopaedia.org/articles/osteomyelitis.

    (iv)    Need for Wound Supplies

The requirement for wound care supplies indicates the presence of ongoing skin injuries or ulcers that need regular management. Consistent need for would care is a clear indication of chronic skin breakdown, as seen in patients who are completely bedridden. This reflects the advanced stage of PPMS where the patient cannot reposition themselves to prevent such injuries and that no one is present to make such repositions on behalf of the patient to prevent the development of ulcers. https://www.woundcareinc.com/medical-equipment/wound-prevention-and-treatment

The presence of these conditions shows that A.L's PPMS and circumstances (a) have dramatically worsened since Lichtman's sentencing 10 years ago, (b) have transitioned to an advanced stage of the disease, and (c) have no one available to provide preventive care—as provided in Lichtman's principle brief—the only "care" being 911 emergency response, which is not the available care envisioned by the Sentencing Commission ("Commission") when promulgating USSG 1B1.13(b)(3)(C).

Considering the above, contrary to the Governments assertion, the record provided by Lichtman here, as it relates back, and before, in his Warden request and principle brief with the "one-page medical record," "Medical Incapacitation" of Lichtman's mother is established. Thus Lichtman presents "medical records or other supporting evidence establishing his [mother is] medically incapacitated and the need for in-home care," differentiating himself from the defendant in *United States v. Gunkel*, 2023 WL 6160612, *2 (N.D. Okl Sept. 21, 2023) (cited by Government, DE: 86).

    **3.    The Government avers that Lichtman failed to establish that he is the "sole" family member available to care for his mother.**

The Government's claim includes that (a) A.L. does not state that she has no other relatives such as a brother, sister, or parent that could care for her, and that (b) Lichtman does not provide a copy of the death certificate confirming that A.L.'s long-time companion and only caregiver passed away.

First, from a legal standpoint, the Government risks effectively usurping Congress's and/or the Commission's authority of writing laws or promulgating policy statements by oppositionally listing requirements found nowhere in statute or policy. Such "requirements" made by the Government but not Congress or the Commission risk undermining Congress's expressed purpose when passing the First Step Act of 2018 and amending the law, as "set forth on the face of the enactment, of 'increasing the use' of sentence reduction motions under section 3582(c)(1)(A)." First Step Act §603(b). Increased use of these motions is a purpose directly born out of and to counteract the BOP's abysmal record, having filed for such motions so rarely. Though they otherwise met the objective criteria established by Congress, the Commission and the BOP policy, the BOP had made for defendants the receipt of compassionate release a near impossibility. The hope is that ever-evolving "requirement" listings argued for by the Government for defendants to meet aren't persuading courts to rebuild a near impossible obtainment of compassionate release for defendants who otherwise meet the new objective criteria as established by Congress and the Commission.

Second, Lichtman's mother, back when she could write wrote "Mitchell is my only child. I have no one else who can assist me and provide the daily care I desperately need." (May 5, 2024, Letter by A.L.). In another letter she wrote "I have no family support, the only possible person who can help me is my son." (Undated Letter by A.L., also provided as part of the record for the Warden request and principle brief.) And again A.L. wrote "My son is the only person I have left to me who can possibly help me." (01/26/2023, A.L. Email).

Last, the governing policy statement says "The incapacitation of the defendant's parent when the defendant would be the only *available* caregiver for the parent." USSG 1B1.13(b)(3)(C). (emphasis added). The diagnosed list of conditions provided by the medical record and outlined earlier establishes that A.L. currently has no *available* caregiver. If she did, she wouldn't be formulating the worst bedsores

6

that can develop on a human body. Though A.L. isn't in one, but if this is something that occurred in an assisted-living facility, lawsuits would ensue and the facility would be shuttered. Such facilities have staff, but if they fail to provide care, are they *available*?

"Avail" is defined as "to be of use or advantage: Help, Benefit." The Merriam-Webster Dictionary (ISBN-13:978-0-87779-930-6, 2004 Ed.). "Available" is defined as "usable, accessible." Id.

Random House Webster's College Thesaurus (ISBN: 0-375-70065-x, 1998 Ed.), lists for "available": Adj. Ready for use, ready for service, free, open, obtainable, accessible, at one's disposal, convenient, on hand. For "avail" (v.) it lists: use, profit from; benefit, help.

Does A.L.'s condition communicate that she is accessing, benefitting, or receiving help from anyone? Consider the excruciating physical pain and tortuous psychological suffering that accompanies being left immobile, by herself, frozen, as sores form exposing and infecting muscle, bone and sinew.

Regarding the Government's requirement of a death certificate for A.L.'s long-time companion who passed away, first, this is not a requirement listed among those established by Congress or the Commission. But, despite this, A.L.'s caregiver after Lichtman's incarceration died in October of 2022, in South Florida. His name was Steven James McIlvain, born in October, 1946. Lichtman is currently working on locating the death certificate, a near impossible task considering him being incarcerated at a facility that is nearly always on lockdown and denying the inmates access to the Corrlinks email system, to any research tools, and to the phones. His goal is to have it as an exhibit for this filing, if it proves possible to locate from Lichtman's position. If finding it has not yet been achieved by the time this is filed, then Lichtman respectfully requests that either additional time be given for him to do so, or, if the Court deems such a document necessary, given the indicators that otherwise show that there is no reason for the claim to be false and that A.L. has obviously lost the care she was receiving, indicating Mr. McIlvain is no longer present and available, then can the Court appoint either the Clerk of Court, a special master, or some other available human resource to conduct a records search?[1]

---

[1] Even if Lichtman proves able to navigate repetitive institutional lockdowns, find the addresses of the area hospitals, morgues, funeral parlors, or offices that issue death certificates—a search he will have to conduct with

7

If Mr. McIlvain was still available, then A.L. would have none of the ulcers from which she suffers and Lichtman wouldn't be requesting for compassionate release.

4. **The Government states that Lichtman offers no reasons why A.L.'s financial situation changed; specifically, what she did with the $720,000.00 earned from the sale of her house in 2021.**

Additionally, the Government implies that A.L. (a) "may receive Social Security disability payments," or (b) assistance from "numerous social programs possibly available."

First, are any of these requirements established by Congress or the Commission?

But, due to A.L.'s condition, insurance companies constantly fight against providing coverage, rendering her unable to secure a doctor. (This is also why it's impossible to get a current doctor's note.) And from the proceeds from selling her home, $500,000.00 went toward paying off the mortgage. Nearly an additional $100,000.00 went toward satisfying existing debt. The remaining amount, just over $100,000.00, was used to live off of. Between her insurance and Medicare lapsing, she had to pay out of pocket not just for food, but too for medical supplies and assistance. This generated a burn rate that depleted the rest of her funds.

Further, she's physically incapable of applying for social security or of reaching out to any possible "programs," though none are known to Lichtman for someone whose PPMS has advanced so far. Just the time that has passed during these filings, Lichtman's mother's condition and circumstances have worsened terribly.

Currently, without Lichtman being able to provide her care, A.L. is going to die either a tortuous death from abandonment in her apartment or if E.M.T's receive a call for a wellness check she will be placed in a state-funded long-term care facility where she will either die a terribly painful death from systemic neglect or be displaced, such programs being badly "supported" by Medicaid. *See* https://www.investopedia.com/medicaid-cuts-would-be-a-blow-to-nursing-homes-11740108 (Medicaid is

---

little to no facility or outside help, he still foresees, if he gets in touch with anyone, they not wanting to provide a copy since Mr. McIlvain was A.L.'s boyfriend, not her husband. And he never formally adopted Lichtman, meaning he has no official familial tie to him. In other words, privacy concerns could be an issue.

the primary funder for long-term care in the U.S., covering more than half of the $415 billion spent annually on services for the disabled. Yet, it remains persistently underfunded, creating structural challenges in delivering quality care.); https://www.ahcancal.org/News-and-Communications/Press-Release/Pages/Just-The-Facts-Medicaid-Critical-Component-Long-Term-Care-System.aspx (Funding GAP contributes to facility closures, reduced staffing, and quality-of-care issues.); https://www.ahcancal.org/News-and-Communications/Press-Releases/Pages/ICYMI-New-HHS-Report-Reveals-Significant-Medicaid-Shortfall-Nursing-Homes.aspx (Between 2020 and 2023, at least 774 nursing homes closed due to financial strain, displacing nearly 30,000 residents. These closures are overwhelmingly linked to inadequate Medicaid support.); https://www.thenationshealth.org/content/53/3/1.1 (Over 80% of U.S. nursing homes reported moderate to severe staffing shortages in 2023, limiting their ability to provide consistent and safe care.); https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10227721 (Assisted living facilities are often exempt from strict federal staffing rules and are regulated at the state level. A 2023 NIH study found that looser regulations correlate with increased hospitalization rates for residents.); https://www.washingtonpost.com/busines/2023/12/17/assisted-living-laws-rules-states (Unlike nursing homes, assisted living facilities are governed by a patchwork of state laws. Some states have strong protections, while others lack even basic care requirements. The Washington Post reported vast inconsistencies in inspections, training, and complaint resolution.); https://www.theguardian.com/society/ng-interactive/2025/may/01/nursing-home-assisted-living-costs-care (Investigative reporting in 2025 by The Guardian revealed how many residents in assisted living pay $10,000+ per month but still suffer from missed medications, neglect, and unsanitary conditions.)

  These examples are but a few among hundreds of reports and recorded violations found systemically across the entire industry. Are these the programs implied by the Government? If so, then, first, A.L. does not possess funds to cover for-profit assisted-facility programs, not that they would help if she did, given their record of failures to do the one job for which they exist. And if the facilities with funding and staff regularly neglect patients, then how much worst would it be for someone indigent like

9

Lichtman's mother at a state-run facility...if one can be found, given how many of them have been forcibly closed and A.L.'s advanced state of PPMS?

But neither of these are legal options anyway, since USSG §1B1.13(b)(3)(C) falls under "*Family* Circumstances," and none of these programs are owned by or employ anyone claiming to be family to A.L. and/or Lichtman. The facilities themselves also do not represent family.

5. **Regarding Lichtman's age at the time of his offense, the Government attempts to differentiate Lichtman from the defendants in the cases cited by Lichtman in his principle brief.**

First, Lichtman provided precedent on this issue in support of the science with which he led the argument in his Warden request and principle brief. The Government provides no opposition in response to the applicable scientific data nor to the Commission's recognition and support of that data.

Lichtman's provision for Court review merely observed the objective fact that the age at which he committed the instant offense falls within the "age-crime curve." (As he stated in his Warden request and principle brief, the provision of such was in no way a statement of mitigation of the terrible crimes in which he engaged and for which he takes responsibility, crimes for which he is very remorseful, having committed his life to putting his remorse in action and invest in the continual betterment of himself and in community outreach, wanting to be someone who helps others, hating that he had ever contributed to others' harm.)

The argument is based on the age-crime curve being a well-established criminological concept demonstrating that criminal behavior and recidivism rates decline significantly with age. This trend is corroborated by multiple studies and official reports. *See* https://www.ussc.gov/research/research-reports/effects-aging-recidivism-among-federal-offenders (The U.S. Sentencing Commission's comprehensive analysis reveals a substantial decrease in recidivism as age increases.); https://bjs.ojp.gov/content/pub/pdf/18upr9yfup0514.pdf (Bureau of Justice Statistics (BJS) report confirms trend of decreasing recidivism with age).

10

Further, it's consistently found that offenders, like Lichtman, with minimal or no prior criminal history exhibit significantly lower recidivism rates across all age groups.

### 6. The Government writes that rehabilitation alone is not an extraordinary and compelling reason for purposes of the policy statement.

In and of itself, this is a correct statement. But Lichtman did not present for the Court's review his rehabilitation record by itself. It was provided in conjunction with USSG 1B1.13(b)(3)(C), a Commission-provided reason that when met is an extraordinary and compelling reason warranting the reduction of a sentence. Further, he provided rehabilitation to be considered "in combination with other circumstances," USSG §1B1.13(d).

### 7. The Government avers that Lichtman's request for early release is inconsistent with the sentencing factors of 18 U.S.C. §3553(a)

The Government mistakenly limits the §3553(a) factors to when they applied at the time of Lichtman's original sentencing, failing to account for their call to be balanced differently for compassionate release purposes. *See United States v. Smith*, 2023 U.S. App. LEXIS 30413, at *3, 2023 WL 7688370 (4th Cir. Nov. 15, 2023) ("When considering the §3553(a) factors," the Court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments," such as changed family circumstances and the defendant's rehabilitation efforts.) *See also United States v. Kibble*, 992 F.3d 326, 335 (4th Cir. 021) (cited in *United States v. Thompson*, 2022 U.S. Dist. LEXIS 210794 (M.D. Fla. Nov. 21, 2022)) ("Section 3582(c)(1) necessarily envisions that the §3553(a) factors may balance differently upon a motion for compassionate release than they did at the initial sentencing." "If a district court's original §3553(a) analysis could always prove that a sentence reduction would intolerably undermine the §3553(a) factors, then 18 U.S.C. §3582(c)(1) would, ineffect, be a nullity."); and in *Pepper v. United States*, 562 U.S. 476, 491 (2011) (citing 18 U.S.C. §3553(a)(1), the Supreme Court found that evidence of post-conviction rehabilitation may plainly be relevant to "the history and characteristics of the defendant"; and that a district court cannot artificially limit itself to a

defendant's past "nature and circumstances of the offense" while ignoring more recent developments, id at 488-89.

## CONCLUSION

**WHEREFORE**, for the reasons stated herein and in his principal brief, Mitchell Lichtman respectfully moves this Court to grant compassionate release by reducing his sentence to time served, and to impose a new term of supervised release for a duration and under such conditions as the Court deems appropriate.

As her sole available care-giver, Mr. Lichtman's release would allow him to take on this vital role, thereby healing and preventing bedsores and infections while improving her quality of life during her final months or years. His presence would directly contribute to her ability to remain at home rather than being institutionalized.

Given Lichtman's demonstrated rehabilitation, minimal risk of recidivism, and the compelling humanitarian circumstances, a reduction to time served followed by supervised release with strict conditions would satisfy the goals of 18 U.S.C. §3553(a), while also advancing compassionate lease principles under 18 U.S.C. §3582(c)(1)(A)(i).

Date: __6/17/25__

Respectfully submitted,

*Mitchell Lichtman*

Mitchell Lichtman, *pro se*
Reg. No. 07443-104
FCI Miami Low
PO Box 779800
Miami, FL 33177

## CERTIFICATE OF SERVICE

I, Mitchell Lichtman, *pro se*, swear under penalty of perjury, pursuant to 28 U.S.C. 1746, that on this 17 day of June, 2025, I have had mailed a true and correct copy of the foregoing Response to Government's Response in Further Support of Compassionate Release via USPS, postage prepaid, to Robert Emery, AUSA, United States Attorney's Office, 9 NE 4th Street, Miami, FL 33132.

/s/ Mitchell Lichtman
Mitchell Lichtman, *pro se*

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

Retail

U.S. POSTAGE PAID
PM
TOPEKA, KS 66603
JUN 17, 2025

33128

$14.95

RDC 03 0 Lb 3.70 Oz S2324P507088-13

UNITED STATES POSTAL SERVICE®

PRIORITY® MAIL

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

CERTIFIED MAIL®

9589 0710 5270 1115 2145 49

- Expected delivery date specified for domestic
- Domestic shipments include $100 of insuranc
- USPS Tracking® service included for domesti
- Limited international insurance.**
- When used internationally, a customs declar...

*Insurance does not cover certain items. For details regarding claims exclusions see the Domestic Mail Manual at *http://pe.usps.com.*

** See International Mail Manual at *http://pe.usps.com* for availability and limitations of coverage.

FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

TRACKED ■ INSURED

PS00001000014

EP14F July 2022
OD: 12 1/2 x 9 1/2

To schedule free Package Pickup, scan the QR code.

USPS.COM/PICKUP

UNITED STATES POSTAL SERVICE®

PRIORITY® MAIL

VISIT US AT USPS.COM®
ORDER FREE SUPPLIES ONLINE

FROM:

Mitchell Lichtman #07443-104
FCI Miami
P.O. BOX 779800
MIAMI, FL 33177

TO:

Wilkie D. Ferguson Jr.
United States Courthouse
400 North Miami Avenue, Room 8
Miami, FL 33128

REC'D BY______D.C.
JUN 24 2025
CLERK U.S. DIST. CT.

Label 228, December 2023

FOR DOMESTIC AND INTERNATIONAL USE

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail® and Priority Mail International® shipments. Misuses may be a violation of federal law. This package is not for resale. EP14F © U.S. Postal Service; July 2022; All rights reserved.

